**SO ORDERED.**

**SIGNED August 27, 2019.**



_____
**JOHN W. KOLWE
UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| In re: <br> Louisiana Pellets, Inc., et al. <br> *Debtors* | Case No. 16-80162 <br> (Jointly Administered) |
| Craig Jalbert, Chapter 11 Liquidating Trustee, <br> *Plaintiff* <br><br> v. <br><br> Southern Strategy Group <br> of Louisiana, LLC, <br> *Defendant* | Chapter 11 <br><br> Judge John W. Kolwe <br><br> Adv. Proc. No. 18-5006 |

### RULING FOLLOWING TRIAL

This adversary proceeding involves a preference claim by Craig Jalbert, Chapter 11 Liquidating Trustee of Debtors Louisiana Pellets, Inc. and German Pellets Louisiana, LLC ("Trustee") against creditor, Southern Strategy Group of Louisiana, LLC ("SSG"). The Court took the matter under advisement following a trial on the merits on July 27, 2019. The Court now rules as follows.

## JURISDICTION

This is a core proceeding under 28 U.S.C. § 157(b)(2). The court may enter final orders on the claims and defenses asserted in this case under *Stern v. Marshall*, 564 U.S. 462 (2011) (bankruptcy court has the power to determine preference actions); *In re Am. Hous. Found.*, 469 B.R. 257, 265 (Bankr. N.D. Tex. 2012) (same); *In re DBSI, Inc.*, 467 B.R. 767, 773 (Bankr. D. Del. 2012) (bankruptcy court has the power to determine preference actions after *Stern*); *West v. Freedom Medical, Inc. (In re Apex Long Term Acute Care–Katy, LP.*), 465 B.R. 452, 463 (Bankr. S.D. Tex. 2011) (same). The following ruling constitutes the Court's findings of facts and conclusions of law.

## BACKGROUND

The Debtor in this case constructed a wood pellet production facility in Urania, Louisiana and briefly operated it from June 2015 to December 2015.[1] Beginning in 2012, the Debtor paid SSG a monthly retainer for SSG to provide governmental affairs and professional consultation services to the Debtor and a related entity, including acting as the qualified entity for the general contractor's license that the Debtor needed to construct the facility. On December 7, 2015, SSG sent a demand letter to the Debtor referring to unpaid amounts due. On December 9, 2015, the Debtor made a payment to SSG in the amount of $24,500.00, the first payment the Debtor had made to SSG since February 2015. The Debtor filed for bankruptcy on February 18, 2016. The Trustee filed this adversary proceeding to avoid the $24,500.00 payment made within the 90 day "preference period" under 11 U.S.C. § 547. At trial, SSG challenged two essential elements of the preference payment action under § 547(b) and presented two defenses: (i) that the payment was made in the ordinary course of business under § 547(c)(2), and (ii) that SSG provided new value for the December 9, 2015 payment under § 547(c)(4). Based on the evidence and testimony adduced at trial, the Court finds that the Trustee has established all elements necessary to support the avoidance action under § 547(b) and that SSG

---

[1] All references to the "Debtor" in this ruling are to German Pellets Louisiana, LLC, the only entity relevant to this adversary proceeding.

failed to prove either its ordinary course of business defense under § 547(c)(2) or its new value defense under § 547(c)(4).

## DISCUSSION

### A. Elements of a Preference Action under § 547(b).

Section 547(b) establishes the elements that the Trustee is required to prove to avoid a preferential transfer:

> **(b)** Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
>
> **(1)** to or for the benefit of a creditor;
>
> **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> **(3)** made while the debtor was insolvent;
>
> **(4)** made--
>
> > **(A)** on or within 90 days before the date of the filing of the petition; or
> >
> > **(B)** between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> **(5)** that enables such creditor to receive more than such creditor would receive if--
>
> > **(A)** the case were a case under chapter 7 of this title;
> >
> > **(B)** the transfer had not been made; and
> >
> > **(C)** such creditor received payment of such debt to the extent provided by the provisions of this title.

*Id*. "The Trustee has the burden of persuasion at trial with respect to each of the elements of a preference claim under 11 U.S.C. § 547(b)." *In re Cent. Louisiana Grain*

3

*Co-op., Inc.*, 497 B.R. 229, 234 (Bankr. W.D. La. 2013). However, § 547(f) provides: "For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." Thus, SSG bears the burden of overcoming the presumption of insolvency.

Most of these elements were stipulated, but SSG challenged the § 547(b)(3) and (b)(5) elements, i.e., that the transfer was made while the Debtor was insolvent and that the transfer enabled SSG to receive more than it would have received otherwise. Put simply, SSG failed to present any evidence sufficient to overcome the presumption of insolvency under § 547(f) or to establish that SSG failed to receive more in the otherwise preferential transfer than it would have received under the alternative scenario set out in § 547(b)(5). With respect to the latter, there is no suggestion that the Debtor will be able to pay its unsecured creditors 100% of the value of their claims, so the preferential payment of $24,500.00 seems certain to be more than SSG could have otherwise received. Accordingly, the Court concludes that the Trustee established all five elements necessary to avoid a transfer under § 547(b) and was therefore entitled to avoid the $24,500.00 payment the Debtor made to SSG unless SSG could prove at least one of its two defenses.

### B. The Ordinary Course Defense.

Section 547(c)(2) sets forth the ordinary course defense. It provides that an otherwise avoidable transfer is not subject to avoidance:

> **(2)** to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
>
> **(A)** made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> **(B)** made according to ordinary business terms;

*Id*. Because the ordinary course exception is an affirmative defense, SSG has the burden of persuasion. *In re Cent. Louisiana Grain Co-op., Inc.*, 497 B.R. 229, 235 (Bankr. W.D. La. 2013) (citing *In re Gulf City Seafoods*, 296 F.3d 363, 368 n.5 (5th

4

Cir. 2002)). Based on the trial record, there is no genuine dispute that the debt reflected by the challenged December 9, 2015 payment was incurred in the ordinary course because it concerned past due amounts owed on SSG's monthly retainer fee. The dispute at trial instead centered on the subjective question of whether the transfers were made in the ordinary course of both parties and the objective question of whether the transfers were made according to ordinary business terms as reflected in the relevant industry. *In re SGSM Acquisition Co. LLC*, 439 F.3d 233, 239 (5th Cir. 2006). As this Court has summarized:

> The subjective prong of the ordinary course defense requires a fact-specific examination of the parties' conduct to determine "whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent." *Lightfoot v. Amelia Maritime Services, Inc. (In re Sea Bridge Marine, Inc.),* 412 B.R. 868, 872 (Bankr. E.D. La. 2008). The factors that courts consider include (1) the time period over which the parties engaged in similar transactions, (2) whether the amount or form of payment differ from past practices, (3) the presence of any unusual collection activity, and (4) whether the creditor took actions that gained it an advantage over other creditors in light of the debtor's deteriorating financial condition. *See Kleven v. Household Bank F.S.B.,* 334 F.3d 638, 642 (7th Cir. 2003); *In re Quad Systems Corp.,* 2003 WL 25947345, at *5 (Bankr. E.D. Pa. 2003). A creditor typically addresses these factors by establishing a "baseline of dealing" as far as the parties' past billing, payment, and collection practices. *In re Accessair, Inc.,* 314 B.R. 386, 393 (8th Cir. BAP 2004) (creditor had "the burden of establishing some baseline of dealings between the parties prior to the preference period"). A creditor must establish that the challenged transfer occurring during the preference period falls within the normal pattern of payment practices between the parties during the pre-preference period. *Id.*

*Cent. Louisiana Grain Co-op., Inc.*, 497 B.R. at 236.

While it is possible to establish that the ordinary course of business between the parties included late payments, for any particular payment to qualify as ordinary, it must be consistent with the timing of other transactions. In other words, while the parties may be accustomed to somewhat late payments, abnormally late payments do

5

not qualify as being made in the ordinary course of business. For example, in *In re Youthland, Inc.*, 160 B.R. 311 (Bankr. S.D. Ohio 1993), the bankruptcy court found that because the debtor routinely paid the creditor up to 90 days late, any payment made within 90 days would qualify as ordinary course transfers, but four payments made more than 90 days late would not qualify and would therefore be avoidable. *See also In re Federated Marketing, Inc.*, 123 B.R. 265 (Bankr. S.D. Ohio 1991) (rejecting the ordinary course defense for a payment exceeding the average payment time of 60 days); *Unsecured Creditors Committee of Sparrer Sausage Company, Inc. v. Jason's Foods, Inc.*, 826 F.3d 388 (7th Cir. 2016) (explaining that "[b]ankruptcy courts typically calculate the baseline payment practice between a creditor and debtor in one of two ways: the average-lateness method or the total-range method. The average-lateness method uses the average invoice age during the historical period to determine which payments are ordinary, while the total-range method uses the minimum and maximum invoice ages during the historical period to define an acceptable range of payments"). The main point is that lateness in itself is not necessarily fatal to the ordinary course defense, but *relative* lateness can be.

If a creditor cannot meet the subjective prong under § 547(c)(2), it may still prevail if it can prove the objective prong, which requires the creditor to show that the challenged transfers were consistent with the relevant industry standard. In order to satisfy this prong, courts require creditors to offer evidence of payment practices between other creditors and debtors in the relevant industry. *Gulf Seafood Inc.*, 296 F. 3d at 369 ("In our view, for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product."). The standard cannot be satisfied by proof of the creditor's own dealings with the debtor or other parties, but "requires references to some external data" involving other creditors and debtors in the relevant industry. *In re Merry-go-round Enterprises, Inc.* 272 B.R 140, 147 (Bankr. D. Md. 1996) (creditor did not sustain its burden of proof at trial because it did not produce evidence of industry practice or custom apart from the creditor's own experience).

Turning to this case, SSG failed to present any evidence to satisfy the objective prong under § 547(c)(2)(B). It presented no industry evidence beyond its dealings with certain other SSG clients, mostly using anonymized data. SSG presented much more evidence concerning the subjective prong under § 547(c)(2)(A), but that evidence conclusively establishes that the December 9, 2015 preference payment was not made in the ordinary course of business. SSG's own pretrial brief states:

> During the time SSG represented German Pellets, October 2012 through March 2016, German Pellets made twenty-six (26) payments in total to SSG, dated between January 2013 and December 2015. The average delay was 185 days, and the delay in payments after the date of invoice ranged [from] 13 days to 474 days.[2]

The Court accepts as true that the average delay in payment over the entire account history was 185 days based on the evidence admitted at trial, particularly the account statement introduced as Exhibit SS4/TR4, which shows the history of the account from its inception to the end of 2015. The problem for SSG is that the December 9, 2015 payment to SSG was substantially later than the average delay. An exhibit introduced as Exhibit TR3 shows that the December 9, 2015 payment was applied to seven monthly invoices dated from November 1, 2014 to May 1, 2015. Even the shortest delay, from May 1, 2015 to December 9, 2015, was 222 days; the longest, from November 1, 2014 to December 9, 2015, was 403 days; and the average age of the invoices covered by the payment was approximately 312 days.

Although the ordinary course of business between the Debtor and SSG allowed for a certain degree of lateness, the December 9, 2015 payment was beyond the pale. Even the *shortest* delay covered by the payment, at 222 days, far exceeds the average delay of 185 days. The Court therefore concludes that the December 9, 2015 payment in the amount of $24,500.00 was not made in the ordinary course of business under either the subjective or objective prong of § 547(c)(2).

---

[2] *See* SSG's Pre-Trial Brief, p. 5 (ECF #34).

## C. The New Value Defense.

In its pre-trial briefing, SSG also raised the new value defense under § 547(c)(4). Section 547(c)(4) provides an exception for transfers:

> **(4)** to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
>
> > **(A)** not secured by an otherwise unavoidable security interest; and
> >
> > **(B)** on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

*Id*. Under § 547(a)(2), "new value" is defined as:

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

*Id*. In other words, a creditor must establish that it provided the debtor with "something new that is of tangible value." *In re Martin Wright Electric Co.*, 2008 WL 114926 at *9 (Bankr. W.D. Tex. Jan. 9, 2008) (citing *In re Fuel Oil Supply & Terminaling, Inc.*, 837 F. 2d 224, 230 (5th Cir. 1988)).

The Trustee argued in pre-trial briefing and at trial that SSG waived the defense by failing to include it in its Answer. As the Court noted at trial, both the Trustee and SSG briefed the defense in connection with the Trustee's Motion for Summary Judgment. Because the defense was raised at a "pragmatically sufficient time," it was not waived. *See, e.g., Rogers v. McDorman*, 521 F.3d 381, 385–87 (5th Cir. 2008).

Turning to the merits, the Court finds, based on the testimony and evidence adduced at trial, that SSG failed to show that it provided any new value to the Debtor after the December 9, 2015 payment. SSG's account statement listed all invoices as

8

being for "Professional Services Rendered," but SSG's principal repeatedly testified at trial that the monthly invoices were a retainer. SSG could point to nothing of value that it had done for the Debtor after the December 9, 2015 payment. At best, SSG's principal referred in his trial testimony to the renewal of a contractor's license for the Debtor's benefit. However, the account statement (Exhibit SS4/TR4) shows that SSG last renewed the license in 2014, and a license renewal form introduced into evidence as Exhibit TR10 plainly shows that the license was not set to expire until March 2016, by which point the Debtor was in bankruptcy and SSG had terminated its relationship with the Debtor. There is no evidence that SSG did anything of value with respect to the contractor's license between the December 9, 2015 payment and the termination of its services.

The Court therefore concludes that SSG failed to show that it provided any new value to the Debtor within the meaning of § 547, so it is not entitled to this defense.

### D. Conclusion

In sum, the Court finds that the Trustee has established as a matter of fact and law that the December 9, 2015 $24,500.00 payment was an avoidable transfer under § 547(b). The Court also finds that SSG failed to prove either its ordinary course of business defense under § 547(c)(2) or its new value defense under § 547(c)(4). The Trustee shall submit a proposed judgment in conformity with the foregoing reasons within thirty (30) days.

9